## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| Ameer Alkayali<br>c/o The Pattakos Law Firm LLC<br>5324 Fleet Ave.<br>Cleveland, Ohio 44105 | Case No. _____ |
| | Judge _____ |
| Weillin Feng<br>c/o The Pattakos Law Firm LLC<br>5324 Fleet Ave.<br>Cleveland, Ohio 44105 | **Complaint with Jury Demand** |
| Kevin Kennelly<br>c/o The Pattakos Law Firm LLC<br>5324 Fleet Ave.<br>Cleveland, Ohio 44105 | |
| Plaintiffs,<br>vs. | |
| Eric Kaler, President<br>Case Western Reserve University<br>c/o Peter Poulos<br>10900 Euclid Ave.<br>Adelbert Hall Room 311<br>Cleveland, Ohio 44106 | |
| Paul Owens, Chief of CWRU Police<br>c/o Peter Poulos<br>10900 Euclid Ave.<br>Adelbert Hall Room 311<br>Cleveland, Ohio 44106 | |
| CWRU Police officer Kurtis Bialowsky<br>c/o Peter Poulos<br>10900 Euclid Ave.<br>Adelbert Hall Room 311<br>Cleveland, Ohio 44106 | |
| CWRU Police officer Milo Drumm<br>c/o Peter Poulos<br>10900 Euclid Ave.<br>Adelbert Hall Room 311<br>Cleveland, Ohio 44106 | |

| CWRU Police officer Michael Jastatt c/o Peter Poulos 10900 Euclid Ave. Adelbert Hall Room 311 Cleveland, Ohio 44106 | |
|---|---|

# I. Introduction

1.      This lawsuit is to address the shockingly unconstitutional conduct of Case Western Reserve University ("CWRU") officials against protesters who had gathered on the University's campus as part of a global protest movement in support of and solidarity with Palestinian civilians facing mass murder, brutal violence, and mass displacement as a result of Israeli military operations in the Gaza Strip.

2.      On the morning of May 7, 2023, Plaintiff protesters had gathered near a mural on the CWRU campus that had been expressly designated by the University as a "Spirit Wall"—a forum for free expression—that had been painted by students with expressions of support and solidarity with Palestinians vis a vis Israel's actions in Gaza.

3.      Defendant Eric Kaler, CWRU's President—who has a well-documented history of discriminating against students and others who express their First Amendment rights to criticize the Israeli government, and, in particular, Israel's discriminatory and deadly policies toward Palestinians—had declared, falsely and contrary to basic logic and reason, that the basic expressions of support for Palestinians that had been painted on the Spirit Wall constituted expressions of "Anti-Semitism," or, in other words, bigotry against Jews. Thus, the University, at Kaler's instruction, had hired painters to paint over the "spirit wall" to censor the pro-Palestinian messages that were painted on it.

4.      As the Plaintiffs, CWRU students, graduates, and community members who had joined the protests, gathered in front of the Spirit Wall to prevent the painters from censoring its message, Defendant CWRU Police officers, at the instruction of Kaler and Defendant Paul Owens, Chief of

the CWRU Police, decided to send a message to the protesters that their expressions of support for Palestinians would not be tolerated on the CWRU campus. They did so by instructing the painters to spray paint over the Plaintiff protesters, coating their bodies with toxic spray-paint from industrial spray-painting machines as the Plaintiffs stood in front of the Spirit Wall.

5.      These actions by CWRU officials, acting under color of Ohio law, constitute clear and egregious violations of Plaintiffs rights to free expression under the First Amendment, and to be free from the use of excessive force by government agents. Kaler, Owens, and the responsible CWRU Police officers who acted at their instruction are therefore all liable to Plaintiffs for the unlawful deprivation of Plaintiffs' constitutional rights under the First and Fourth Amendments to the U.S. Constitution as set forth herein.

## II. Parties

6.      Plaintiffs Kevin Kennelly, and Weillin Feng are residents of Cuyahoga County, Ohio and current or former students of CWRU who participated in the pro-Palestine protests at CWRU during the 2023-24 academic year.

7.      Plaintiff Ameer Alkayali is also a resident of Cuyahoga County, and lives across the street from the CWRU campus. Since 2001, Alkayali's family has owned and operated The Alegebra Tea House on Murray Hill, a restaurant and cafe that is a popular stop for CWRU students and community members.

8.      Defendant Eric Kaler, sued in his individual and his official capacity, was, at all relevant times, President of CWRU, an Ohio-incorporated not-for profit corporation which offers accredited undergraduate and graduate degrees in a large array of subject areas, as well as conducting scientific and medical research, and owns property in Cuyahoga County, Ohio where the complained-of events took place.

9.      Defendant Paul Owens, sued in his individual and official capacity, was, at all relevant times,

Chief of the CWRU Police Department, a police force operating with full legal authority to enforce the laws of the City of Cleveland and the State of Ohio, and had responsibility for implementing public safety and law enforcement policies instituted by Defendant Kaler as well as in training and supervising the lawful exercise of authority and enforcement of law by his officers.

10.     Defendant CWRU Police officer Kurtis Bialowsky, sued in his individual capacity, was at all relevant times employed by CWRU as a peace officer maintaining order and enforcing the laws of the State and CWRU policies and procedures for public safety on the grounds of CWRU, acting under color of state law.

11.     Defendant CWRU Police officer Milo Drumm, sued in his individual capacity, was at all relevant times employed by CWRU as a peace officer maintaining order and enforcing the laws of the State and CWRU policies and procedures for public safety on the grounds of CWRU, acting under color of state law.

12.     Defendant CWRU Police officer Michaeal Jastatt, sued in his individual capacity, was at all relevant times employed by CWRU as a peace officer maintaining order and enforcing the laws of the State and CWRU policies and procedures for public safety on the grounds of CWRU, acting under color of state law.

### III. Jurisdiction and Venue

13.     This Court has federal-question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for claims raised under 42 U.S.C. § 1983 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for claims raised under Ohio law.

14.     This Court has jurisdiction over Defendants because they are residents and/or employees of political subdivisions, of the State of Ohio, and at all times were acting under color of state law.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts upon which the claims in this litigation are based and the damages resulting therefrom took place in Cuyahoga

County, Ohio.

## IV. Facts

16.     A well-publicized protest movement erupted nationally and internationally in the wake of the Israeli government's bombardment and siege of the Gaza Strip following an October 7, 2023 attack on Israel by Palestinian forces resisting Israel's occupation of Gaza.

17.     Many of these protests took place student "encampments" on university and college campuses across the U.S., which were designed to highlight the precarious refugee status of displaced Palestinians, and encourage Americans and American Universities to withhold their support for the Israeli regime as it carried out such policies.

18.     These protesters were particularly concerned that (A) tens of thousands of innocent Palestinian civilians, including tens of thousands of children, as well as numerous journalists, medical professionals, and aid workers, have been killed by Israel's bombing campaign in Gaza, and at a rate unprecedented in modern history; (B) more than half of the buildings in Gaza have been reduced to rubble by Israel's bombs, as well as critical civil infrastructure, creating a humanitarian crisis for the more than 2 million people confined by the Israeli government within Gaza's narrow borders; and (C) Palestinians do not have equal rights under the law within Israel's borders (including within the heavily blockaded Gaza Strip), and are instead subject to a regime that discriminates against them based on their ethnicity and religious beliefs.

19.     The student protests attracted extensive press coverage, bringing national attention as well as along with hysterical and intemperate response by University officials who are either directly aligned with the Israeli government's policies toward Palestinians, or who fear being smeared by propagandists as "anti-Semitic" if they failed to quash pro-Palestinian voices.

20.     An encampment was established by protesters at CWRU, on the circular lawn in front of Kelvin Smith Library, where the University expressly permitted this protest activity, designing it as a

public forum for First Amendment-protected conduct.

21.     Plaintiffs separately and individually participated in peaceful protests at the CWRU

encampment in the days leading up to May 7, 2024.

22.     On the night of May 6, 2024 students painted a mural on the Spirit Wall located between

CWRU's Thwing Center and Tinkham Veale University Center, which included, as noted in reports

at Cleveland.com, phrases such as "I dream of breaking the siege" and "come together in peace" as

well as statistics reporting the number of child Palestinian deaths since the commencement of the

attack on Gaza.[1] Earlier in the day, activists also painted on the Advocacy Wall. which, as the name

implies, serves the "primary purpose" of allowing students "to express and advocate for issues that

are important to them" per the current Student Advocacy and Spirit Wall Policy of CWRU, updated

October 14, 2024, and available at https://case.edu/studentlife/university-policies/student-

advocacy-and-spirit-wall-policy (last accessed May 14, 2025). The Spirit Wall and Advocacy Wall

were expressly designated by CWRU as fora for First Amendment-protected expressive conduct.

23.     In a May 7 email to students, CWRU President Eric Kaler declared that "protesters at the

non-sanctioned encampment on Kelvin Smith Library Oval painted an advocacy wall near Eldred

Hall with language the university administration and many members of our community view as

threatening, intimidating and antisemitic." The email added that "later in the evening, the protesters

painted the spirit wall near Thwing Center with language that was less threatening but still

intimidating to some in our community." In response, CWRU determined to paint over the

---

[1] Molly Walsh, "Painters spray-painted over pro-Palestinian protesters at Case Western Reserve University," CLEVELAND.COM, May 8, 2024 (updated May 13, 2024), available at https://www.cleveland.com/education/2024/05/deeply-sorry-case-investigating-after-Painters-painted-over-pro-palestinian-protesters.html (last accessed May 14, 2025).

supposedly offending material and either through a pre-existing or new contract, engaged KC Painting and/or Craftsman to carry out the task.[2]

24.    Kaler's email did not speficially refer to any material painted on either the Spirit Wall or the Advocacy Wall that could have been reasonably construed to be "Anti-Semitic," as no such material was ever painted on either Wall.

25.    When students learned that the university intended to paint over the walls they gathered around the Spirit Wall around midnight, and advised Calo and Doe, who were present to fulfill the contact between CWRU and KC Painting and/or Craftsman, and CWRU Police officers that they intended to prevent the painting. Calo and Doe left, after discussing plans to return with officers.

26.    Plaintiffs Feng and Alkayali learned that the painters intended to return around 5:00 AM of May 7, anticipating limited student presence to deter them. Feng and Alkayali accordingly arrived at the Spirit Wall before 5:00 the next morning and found the painters and CWRU Police officer Defendants Bialowsky, Drumm, and Jastatt preparing to paint over the wall.

27.    As anticipated, a small number of students were present at the Spirit Wall, including Plaintiffs Feng and Alkayali. Plaintiff Kevin Kennelly, who was then preparing for the last exams of his undergraduate career, had spent the night working on an assignment for finals week. As he walked back to his home he passed the Spirit Wall and saw the students, the painters, and CWRU Police officer Defendants gathered around the wall. He stopped to watch.

28.    When the Police and painters arrived at the Spirit Wall around 5:00 AM they were obviously prepared to paint over the mural. The painters had paint spraying machines. The Police Defendants were uniformed, armed peace officers under Ohio law. Cleveland Division of Police General Police Order 4.03.04, effective July 19, 2021, provides that "CWRUPD officers have the same authority as Division officers . . . [o]n property expressly owned, leased, or contracted by Case Western Reserve

---

[2] Walsh, fn1, *supra*.

University."[3]

29.     CWRU Police were thus present as representatives of the CWRU administration and President Kaler, and acting under color of state law as peace officers pursuant to R.C. 2935.01(B). The painters were also agents of CWRU and its administration through the contract with KC Painting and/or Craftsman.

30.     Plaintiffs Feng, Kennelly, and Alkayali separately decided to stand against censorship of the messages on the Spirit Wall and to block the Defendant Painters from covering the mural. They stood in a line across the wall, within inches of the wall.

31.     By this point, the CWRU Police officer Defendants were speaking over radio or phone with Kaler, Owens, and/or agents of Kaler or Owens to receive instructions on how to proceed.

32.     The painters, seeing Plaintiffs in position, initially balked at painting over them. Calo asked Defendant officers if the CWRU Police officers would move the Plaintiffs. The officer Defendants declined to do so.

33.     The painters asked what they should do, to which Officer Drumm replied with words to the effect of, "if they don't move, it's on them." On video Officer Drumm can be heard stating to the painters that "we're just advising them that they're gonna get paint on 'em . . . we're just here."[4] Officer Drumm also advised Plaintiffs not to touch the paint sprayers, as they were dangerous.

34.     Officer Defendants thus, while acting under color of law, asserted authority over Plaintiffs, seized them, and applied force against them within the meaning of the Fourth Amendment of the United States Constitution, by ordering the painters to paint over the Plaintiffs with toxic spray-paint after Plaintiffs declined to make the false choice between avoidance of physical attack and

---

[3] Available at https://www.clevelandohio.gov/sites/clevelandohio/files/policies-procedures/4.03.04%20Protocol%20-%20Case%20Western%20Reserve%20University%20Police.pdf (last accessed May 14, 2025).

[4] https://www.youtube.com/watch?v=hygwau-rKNo (last accessed May 14, 2025).

lawful protest.



*CWRU Officer Milo Drumm: "We're just here."*

35.    Doe, under the direct supervision and authorization of Calo and the Defendant officers,

then proceeded to apply paint to the wall, and to the bodies of Plaintiffs, one after the other.



36.     Plaintiffs remained in front of the mural after being painted on, until the painters determined

that they could not paint over the rest of the mural with Plaintiffs still standing in front of it, and

resolved to return later.

37.     All three Plaintiffs were coated by the toxic spray paint. They then left the scene to attempt

to wash off the paint. Officer Defendants did nothing to protect the Plaintiffs from being sprayed

by CWRU's painters, and in fact expressly instructed the painters that they could discharge spray paint on the Plaintiffs, also warning Plaintiffs not to touch the painters.

38.     These actions by the Officer Defendants are consistent with CWRU's policy of using physical force to remove student protestors and to enforce a policy of falsely equating support for Palestinian or criticism of the Israeli government's policies toward Palestinians with antisemitism in order to justify said force.

39.     Many CWRU students and other witnesses have taken note of this policy, even before the events of October 7, 2024 led to an escalation of this conflict.

40.     For example, on November 11, 2022 the CWRU campus newspaper, *The Observer*, published an editorial by staff writer Milo Vitter criticizing Kaler's public response to a resolution passed by CWRU's Undergraduate Student Government calling for "boycott, divestment, and sanctions" against Israel regarding its policies toward Palestinians. This resolution had prompted Kaler to send an email to the entire CWRU community calling this resolution "anti-Semitic" and "an aggression towards the Jewish members of our community."[5] In criticizing Kaler's response, Vitter noted the obvious difference "between antisemitism and legitimate criticism of Israel" in discussing a resolution passed by CWRU's Undergraduate Student Government "demanding that Case Western Reserve University divests from companies that are complicit in the genocide of Palestinians in Israel." Vitter's piece further specified that this resolution "begins by summarizing the offenses that Israel has committed," including "the blockading of the Gaza strip, displacement of Palestinians by government-sanctioned settlement in the West Bank, targeted killings of Palestinians and more," and then stated "that CWRU has previously participated in a boycott of Sudan" based on similar

_____

[5] Milo Vitter, "Eric Kaler's statement about USG's Israel resolution is disingenuous," THE OBSERVER, Nov. 11, 2022, available at https://observer.case.edu/eric-kalers-statement-about-usgs-israel-resolution-is-disingenuous/ (last accessed May 14, 2025).

"human rights violations." Finally, Vitter noted that "the tactic of calling antisemitism whenever Israel is criticized—no matter the extent to which the claims are actually antisemitic—has long been used to justify an otherwise indefensible state that regularly and systematically engages in human rights violations, and it is a major point of contention among Jewish communities (who do not monolithically support the Israeli government)."

41.     A November 11, 2022 report by *Ideastream*[6] also noted Kaler's "condemn[ation]" of the resolution as being "profoundly anti-Israel and profoundly anti-Semitic," as well as Kaler's claims that a vote on the resolution was an "aggression toward the Jewish members of our community," and that "undoubtedly [the resolution] promotes anti-Semitism" because it calls for disinvestment of "naïve list of companies." This *Ideastream* article also quotes a CWRU student as stating that "[t]he fact that [Kaler] calls [the resolution] antisemitic is just a slap in the face to actual antisemitism." This student also took note of Kaler's biased approach in addressing this conflict on campus, as he "chose to meet with Jewish students and the Hillel Organization, yet completely ignored talking to any Muslim/Middle Eastern students or associations." The article further discusses Kaler's history of opposing Israeli disinvestment initiatives, citing his 2013 letter as University of Minnesota President when he wrote that Boycott, Disinvestment and Sanctions movements "undermine academic freedom."

42.     One week later, on Nov. 18, 2022, the *Observer* published another piece, this one by its Executive Editor Shreyas Banerjee, titled "Kaler's email puts CWRU and USG in national spotlight, bringing risk to students."[7] This article illustrated Kaler's bias by noting his ties to The American

---

[6] Connor Morris, "Case president criticized for calling student antisemitic over Israel divestment push," IDEASTREAM PUBLIC MEDIA, Nov. 11, 2022, available at https://www.ideastream.org/news/education/2022-11-11/case-western-president-criticized-for-calling-students-antisemitic-over-israel-divestment-push (last accessed May 14, 2025).

[7] Shreyas Banerjee, Kaler's email puts CWRU and USG in national spotlight, bringing risk to students," THE OBSERVER, Nov. 18, 2022., available at https://observer.case.edu/kalers-email-puts-

Jewish Committee (AJC), "a national Jewish advocacy group," that "praised" Kaler's "bravery," "courage[,] and strong moral vision" "in clearly and forcefully condemning the undergrad student government,' while also noting that Kaler "is an alumnus of AJC's 'Project Interchange' program, [who] participated in an AJC delegation to Israel in 2018 to meet with Israeli officials, policy-makers and educators." Banerjee's article also reported that "multiple [CWRU] professors have expressed concern regarding [Kaler's] statement and the position it has put CWRU students in," with one professor "compar[ing] Kaler's email with 'dous[ing] [a fire] with kerosene.'" Philosophy professor Jeremy Bendik-Keymer was quoted as criticizing Kaler's email "and threats to USG officers" as "clearly add[ing] fuel to the fire," "legitimiz[ing] an extreme and adversarial, even existentially threatening, interpretation of the situation," and "put[ting] students at increased risk" in a manner that is "unacceptable for a college president to do." "Some faculty are scared of the president," the Professor added, "with some saying that they will not publicly comment out of fear of reprisal during [promotion and tenure] review and anonymous letters have begun to circulate."

43.     By November 6 of 2023, "hundreds of [CWRU] community members"[8] participated in a walkout organized by several CWRU student groups, including the Black Student Union, had "organized a walk-out in protest of university President Eric Kaler, arguing he has divided the campus by failing to acknowledge Palestinian lives lost and Israeli war crimes during the ongoing" conflict.[9] This walk-out "also called attention to the impact of the Israel-Hamas [conflict] on campus

---

cwru-and-usg-in-national-spotlight-bringing-risk-to-students/ (last accessed May 14, 2025).

[8] Téa Tamburo, "CWRU community walks out on university's Israel-Hamas war response," THE OBSERVER, Nov. 10, 2023, available at https://observer.case.edu/cwru-community-walks-out-on-universitys-israel-hamas-war-response/ (last accessed May 14, 2025).

[9] Connor Morris, "Case Western Reserve University students walk out over school president's stance on Israel-Hamas war," IDEASTREAM PUBLIC MEDIA, Nov. 6, 2023, available at https://www.ideastream.org/education/2023-11-06/case-western-reserve-university-students-walk-out-over-school-presidents-stance-on-israel-hamas-war (last accessed May 14, 2025) (internal punctuation marks omitted).

and an alleged lack of support for Palestinian students from the campus administration." An Ideastream reporter[10] quoted CWRU Professor Ayesha Bell-Hardaway, who attended this walk-out, as stating that she wished the University were doing more to make sure all students "feel safe and heard." And an *Observer* report about this protest[11] quoted numerous students, including those who noted that Kaler's public statements about Israel "make it 'seem like he doesn't care about the Muslim community or the Palestinian community especially." As one student noted, "[Kaler's] administration has repeatedly tried to silence [pro-Palestine voices], and that is not okay."

44.     Since the beginning of the protests after October 7, 2023, Kaler has continued to pursue policies which muted, censored, and elided pro-Palestinian viewpoints, such as those in the mural on the Spirit Wall, under the guise of protecting students from "antisemitism." Enforcement of Kaler's policies, and training to ensure such enforcement was lawful and within constitutional bounds, was the direct responsibility of Defendant Owens, with Kaler the ultimate decisionmaker on the content of the policies.

45.     In a letter published at *Cleveland.com* on May 23, 2024, a Jewish resident of Cleveland named Hannah Morris wrote: "This month, I've seen my faith shared between students of all religions with kindness. But Case Western Reserve University President Eric Kaler misrepresented my faith by saying the CWRU encampment fostered hate. Kaler is exploiting a longstanding misconception that calling for Palestinian liberation is antisemitic."[12]

---

[10] C. Morris, fn 9, *supra*.

[11] Tamburo, fn 8, *supra*.

[12] Hannah Morris, "Misguided allegations of antisemitism at CWRU do not keep Jews or Palestinians safe," CLEVELAND.COM, May 23, 2024, available at https://www.cleveland.com/letters/2024/05/misguided-allegations-of-antisemitism-at-cwru-do-not-keep-jews-or-palestinians-safe.html (last accessed May 14, 2025).

46.     By July of 2024, the Cleveland & Northern Ohio Chapter of the Council on American-Islamic Relations (CAIR-Ohio) filed a Title VI complaint against CWRU "following months of alleged targeting and intimidation against students involved in [the] Students for Justice in Palestine [movement]."[13] This complaint details CWRU's "pattern of different treatment when it comes to Palestinian students, as well as their affiliates and allies," whereby the University has not only "refus[ed] to engage with these students," but has actively "smear[ed] them in widespread campus emails," "fail[ing] to account for their safety, well-being, and learning environment," and "deliberately act[ing] against them." More specifically, CAIR's complaint asserts that CWRU has targeted students in retaliation for their political speech and support for Palestinian rights, highlighting multiple incidents where students faced disciplinary actions, including suspensions and bans from campus due to their participation in protests related to Gaza. The CAIR complaint alleges that CWRU imposes a "Palestine Exception," whereby students, faculty, and staff who advocate for Palestinian liberation are subjected to heightened scrutiny, discrimination, and retaliation, detailing the suspension of student leaders, and the general crackdown CWRU has imposed on Pro-Palestine protest activities.

47.     On November 18, 2024, national publication The Intercept published an article titled "'Palestine Exception' Looms Over Campus Gaza Protest Battles," highlighting CWRU's treatment of pro-Palestinian students and protesters on its campus.[14] This article took note of various "interim

---

[13] CAIR Ohio, "CAIR-Ohio Files Title VI Complaint Against Case Western Reserve University on Behalf of Palestinian Students," CAIR, July 22, 2024, available at https://www.cair.com/press_releases/cair-ohio-files-title-vi-complaint-against-case-western-reserve-university-on-behalf-of-palestinian-students/ (last accessed May 14, 2025).

[14] Akela Lacy, Yazan Mohammad, "From campus to the Courts, the "Palestine Exception" Rules University Crackdowns," THE INTERCEPT, Nov. 18, 2024, available at https://theintercept.com/2024/11/18/gaza-protest-campus-palestine-exception/ (last accessed May 14, 2025).

suspensions" and "warnings" and orders barring graduates from campus that CWRU issued to those involved in the Palestine protests in the spring of 2024. The article also notes that Yousef Khalaf, president of CWRU's Students for Justice in Palestine chapter, was suspended for the fall semester for having chanted, "From the river to the sea, Palestine will be free," which CWRU deemed to be "intimidating behavior."

48.     After the Plaintiffs were spray-painted by the CWRU contractors on May 7, 2024, video of the incident went viral and prompted news coverage on local television stations. In the face of the growing public outcry against the incident, Kaler issued an email at 7:15 PM on May 7, 2024, declaring as follows:

> I have reviewed video footage, which depicts students blocking the wall as a third-party contractor spray painted directly onto protesters as he attempted to finish painting the wall, and I am disturbed by what occurred.
>
> Let me be clear: No students—or any individuals—should ever be treated this way, especially on a campus where our core values center on providing a safe, welcoming environment. This is not who we are as an institution, and I am deeply sorry this ever occurred.
>
> The university will continue to fully investigate these actions and hold individuals responsible for this behavior, **including the failure of our own officers to intervene**. (emphasis added).

49.     Plaintiffs have, to date, never been interviewed as part of any investigation into the events of May 7, 2024. Plaintiff Alkayali attempted to file a report of the incident with the CWRU Police on or about May 7, 2024. CWRU Police advised that they would investigate and would contact him. They have never contacted him since.

50.     CWRU employees, agents, or representatives eventually fully painted over the mural.

51.     The CWRU Police officer Defendants, acting under color of law, not only failed to prevent the painters from spray-painting over the Plaintiffs, they expressly authorized the painters to physically assault Plaintiffs with spray-paint as if such conduct were lawful, constitutional, and

appropriate. By these actions the Defendant officers asserted authority over Plaintiffs with a false choice between lawful protest including physical attack, or allowing their First-Amendment-protected protest activity to be chilled by threats of violence.

52.     Defendant Kaler, as the ultimate decisionmaker regarding of the content of CWRU policy and procedure regarding student expression and First Amendment protection, acted under color of law to deprive Plaintiffs of their constitutional rights by implementing a policy of censoring and punishing dissent expressive of pro-Palestinian views, including by expressly authorizing, approving, and knowingly acquiescing to the painters actions in coating the Plaintiffs with toxic spray-paint. Kaler also possesses managerial and supervising authority over the CWRU Police, including Defendant Chief Owens, who reports directly to Kaler.

53.     Defendant Police Chief Owens and the CWRU Officer Defendants, acting under color of state law, and acting to enforce Kaler's discriminatory policy, authorized, caused, and ratified the actions of the painters in spraying toxic paint on the Plaintiffs in order to force them to surrender their protest of the University's actions regarding the Spirit Wall.

54.     As a direct and proximate result of the actions of Defendants, Plaintiffs suffered harm and Defendants are liable for damages under 42 U.S.C. § 1983.

### V. Causes of Action

**First Cause of Action**
**Excessive Force**
**Fourth Amendment and 42 U.S.C. § 1983**
**(against all Defendants)**

55.     Plaintiffs reincorporate the foregoing paragraphs as if wholly rewritten herein.

56.     This cause of action is asserted against all Defendants named in this Complaint, in their respective individual capacities.

57.     Plaintiffs possess a right under the Fourth Amendment to the United States Constitution to be free from the unreasonable exercise of force against their persons that was clearly established as

of the dates at issue in this Complaint.

58.     Defendants caused, authorized, and ratified the painters' actions in physically attacking and battering Plaintiffs by coating their respective bodies with toxic spray-paint in knowing violation of Plaintiffs' Fourth Amendment right to be free from excessive force. The painters would not have taken these actions if not for the Defendants' conduct, which was taken under color of state law and within the scope of their duties as law enforcement officers or executives with supervisory power and authority over law enforcement officers, and which was objectively unreasonable in light of the facts and circumstances confronting the officers at the time.

59.     Reasonable officers in the respective positions of these Defendants would not have initiated any such use of force against the Plaintiffs.

60.     As a direct and proximate cause of these actions by these Defendants, which reflect wanton and intentional disregard for Plaintiffs' rights, Plaintiffs have suffered economic and non-economic damages for which these Defendants are liable. Plaintiffs are also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count Two**
**Retaliation**
**First Amendment and 42 U.S.C. § 1983**
**(against all Defendants)**

61.     Plaintiffs reincorporate the foregoing paragraphs as if wholly rewritten herein.

62.     This cause of action is asserted against all Defendants named in this Complaint, in their respective individual capacities.

63.     Plaintiffs each engaged in First Amendment-protected conduct—including in expressing support for Palestinians, and in protest against censorship of their political views—when they stood in front of the Spirit Wall to prevent it from being repainted. The First Amendment right to protest on university campuses, particularly on a portion of university property that was designated as a forum for protest activity as the Spirit Wall was here, was well-established as of the date of this

incident.

64.     The Defendants' actions in authorizing, approving, and knowingly acquiescing in the painters' actions in spray-painting over the Plaintiffs' bodies were motivated in substantial part by a desire to punish the Plaintiffs for exercising their First Amendment rights. Defendants knew, when they authorized, approved, and acquiesced to such conduct that they would be adversely affecting the Plaintiffs by such action, and acted with intent to adversely affect the Plaintiffs.

65.     The Defendants were acting under color of law at all relevant times, and took official action under color of law in authorizing, approving, and acquiescing to the painters spray-painting the Plaintiffs.

66.     A person of ordinary firmness would be deterred from exercising their First Amendment rights if such person knew that officers or agents of the State would be permitted to coat their bodies in toxic spray paint in retaliation for such exercise of First Amendment rights. *See Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).

67.     As a direct and proximate result of the Defendants' actions, Plaintiffs have suffered economic and non-economic damages for which these Defendants are liable. Plaintiffs are also entitled to punitive damages based on this unlawful and unconstitutional conduct.

## VI. Prayer for Relief

Wherefore, Plaintiffs respectfully pray for judgment against Defendants in an amount in excess of $75,000 together with punitive damages, attorneys' fees, costs, expenses, and any other relief to which Plaintiff may be entitled or that the Court deems equitable and just.

## VII. Jury Demand

Plaintiffs demand a jury trial on all issues within the Complaint.

Respectfully Submitted,

*/s/  Peter Pattakos*
Peter Pattakos (0082884)

peter@pattakoslaw.com
Gregory Gipson (0089340)
 ggipson@pattakoslaw.com
Zoran Balac (0100501)
 zbalac@pattakoslaw.com
Maryam Assar (0104229)
 massar@pattakoslaw.com

THE PATTAKOS LAW FIRM LLC
5324 Fleet Ave. 2d Floor
Cleveland Ohio 44105
P: 330.836.8533/F: 330.836.8536

*Attorneys for Plaintiffs*